

FILED
MAY 05 2017

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| TRACY STRAND, | CIV 16-4037 |
| Plaintiff, | |
| -vs- | MEMORANDUM OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT |
| CHARLES MIX COUNTY, A POLITICAL SUBDIVISION OF THE STATE OF SOUTH DAKOTA, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Defendant Charles Mix County ("County"), filed a motion for summary judgment in this discrimination action brought by Plaintiff, Tracy Strand ("Strand"), pursuant to the Americans with Disabilities Act ("ADA"). (Doc. 20.) For the following reasons, the motion will be denied.

## BACKGROUND

The facts are taken primarily from Plaintiff's Supplemental Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, Doc. 27, because, on summary judgment, this Court views the facts in the light most favorable to the non-movant.

Strand began working for the County as a road grader in its highway department in 2007. He was primarily responsible for grading the road east of Platte with a coverage area of approximately 127 miles. Rick Sternberg ("Sternberg") has been employed with the County since the early 1990s and was Strand's direct supervisor and foreman at all relevant times. From 2009 to present, Doug Kniffen ("Kniffen") was the highway superintendent and Sternberg's supervisor. The County has thirteen employees in its Highway department including Sternberg and Kniffen.

During the spring, summer and fall, the County's grader operators could have work days up to ten hours long. They were given two fifteen minute breaks during the day and a half-hour break for lunch. The County did not have a written policy on bathroom usage or a policy on whether employees could drive to the shop to use the bathroom. (The highway department had shops in Platte, Lake Andes and Wagner.) It was commonly understood that if the County employees had to go to the bathroom, they would just go outside wherever they were. County employees brought toilet paper with them while working in the event they had to go to the bathroom. There were times, but not often, that Strand had to urinate outside while he was working, but he does not recall ever defecating outside during his work prior to his cancer diagnosis in 2010. Strand observed other employees drive to use a bathroom and other employees told him that they did so.

According to Sternberg, getting leave "isn't a big deal." There is a calendar hanging on the break room wall and employees just write down the days they are going to be gone. It is "common courtesy" for the employee to tell him what days they have written down to be gone. Likewise, if an employee is sick, the employee calls Sternberg; when the employee comes back, he fills out "sick leave" on his time card and gives the time card to the secretary. Employees out on sick leave can also decide to use vacation time too. An employee should call and let Sternberg know that they will be out for a couple of days. If they can't get ahold of him, they should call Kniffen or the next channel. There is no training for employees about how to get leave approved.

In May 2010, Strand was diagnosed with advanced stage colon cancer. He was off work from May 2010 until the summer of 2011. During that time he had two surgeries, the second of which involved removal of a portion of his colon. Chemotherapy and radiation followed. After completing his cancer treatment, Strand returned to work as a road grader for the County part-time for a while and then full-time beginning July 1, 2011. Prior to his cancer diagnosis, Strand did not have issues with bowel control or frequent waste elimination. As a result of his colon resection surgery, Strand experienced a change in his bowel movements. In his deposition, Strand describes his post-surgery bowel movements as loose, more frequent and more problematic. It varies from day to day.

Sometimes he has to eliminate waste up to ten times a day. He would bring his own toilet paper to work, and his wife had to bring toilet paper to him at work on a couple occasions when he ran out.

When he returned to work after his cancer treatments, Strand told supervisors Sternberg and Kniffen that the effect of the treatment was more frequent or more problematic bowel issues. Strand recalls talking to Kniffen twice and Sternberg about a half dozen times about his bowel elimination needs between his return to work in 2011 and his termination in 2014. Kniffen said it was "common sense" that Strand would have bowel frequency; he thought Strand would just stop work more often. Sternberg told Strand to defecate in a field, in a tree belt or to go behind a tire. Strand said that was unacceptable and indicated that he wanted to be able to drive to use a toilet to eliminate waste, preferably at one of the County's shop buildings. Sternberg told Strand that he could not drive to use an indoor toilet. Strand asked Kniffen about the possibility of having a port-a-potty at the County gravel pit or at roadside locations where he worked. Strand claims that Kniffen's response was to say that port-a-potties were not necessary. Kniffen denies that conversation and says he would have accommodated Strand if he had known Strand needed a place to go to the bathroom. Kniffen says he even would have allowed Strand to drive to the shop to use an indoor bathroom. Sternberg recalls Strand generally asking about having port-a-potties around the County and in the gravel pit, and he replied that it was the contractors' responsibility to have port-a-potties, not his. But Sternberg denies that Strand ever asked for any accommodation of his bathroom needs. When asked if Strand would have asked for accommodations, Sternberg testified:

> Q. [Ms. Pochop] What would you – what should you have said if [Strand] would have brought up [his need to go to the bathroom more frequently after his cancer treatments?].... What do you imagine your response to that would have been under your policies?
> ....
> A. [Mr. Sternberg] I assume that – you know, like I said, call. It's just common sense. If you got a – anybody sick or got problems, if you – if you got to go every 5 minutes, you shouldn't be in a blade. Call me and I'll switch with you, and you can go home. You know, if you got a medical condition, you shouldn't be in a blade.
>
> Q. What do you mean, "if you've got a medical condition, you shouldn't be in a blade?"

> A. If you got medical condition, you shouldn't be running a 230,000-dollar piece of equipment on a public road where people can get hurt.

(Sternberg Depo at 61-62).

In April 2014, Strand was driving a gravel dump truck at the County's gravel pit in Wagner when he needed to use the bathroom. After Strand dumped the gravel from his truck, he told a co-worker that he would briefly be out of the line of trucks, and he drove 5 or 6 miles to the County's shop bathroom in Wagner. When Strand returned to the County's Platte shop that evening, Sternberg confronted him and asked why he had left the line that day. Strand told him that he had to use the restroom in Wagner. Sternberg told Strand that he should relieve himself behind the gravel pile at the pit. Strand said he can't do that. Strand had observed other drivers drive to use a bathroom and other drivers have told him that they do so.

Strand testified that every time he left work for a doctor's appointment, Sternberg would follow him out of town. Sternberg denies this. On one occasion in May 2014, Sternberg told Strand that he had followed him to see if he went to a chiropractic appointment from work. Sternberg accused Strand of going home instead of to his chiropractic appointment because Strand had not driven to a chiropractic office in Platte. But Strand has seen a chiropractor in Gregory, South Dakota since 2007. Sternberg admitted that he disagreed with Strand taking sick leave instead of vacation time after going to a chiropractor one day.

Strand's wife called Sternberg on May 13, 2014, to inform him that Strand was sick due to a kidney infection. Strand also missed work on May 14 and 15, but did not call in. He did not know that he needed to call in those days. A note from Strand's doctor releasing him from work on May 13, 14 and 15 was filed in Strand's personnel file by the County auditor on May 16, 2014. Sternberg admitted that the leave policy is "very relaxed" and that he does not know if Strand violated any County policy by not calling in on May 15 and 16. Strand had not been required to call in during his extended leave for his cancer treatment so this was new to him. Sternberg did not say anything to

Strand about this sick leave when Strand returned to work after May 15 until his termination on June 12.

On June 10, 2014, Sternberg expressed disagreement with how Strand was blading the road and asked him to do it differently. Sternberg talked to Kniffen about reprimanding Strand. Kniffen talked to the County Commissioners. On June 12, 2014, Sternberg called Strand into his office and gave him two reprimands. The first sheet titled "Tracy Strand 1st Reprimand" states:

> Was told by Forman [sic] to pick windrow up when Blading on Tues. June 10 Thursday June 12th was told Again and Was Snippy about it when I told him to do it Right. Was told By Myself and other froman [sic] on How to Law Graven and continuously does it different way.

(Doc. 27, Tab 4.) Sternberg first told Strand that he was reprimanding Strand for not blading properly. (Strand Depo at 89). Strand replied that he had been blading for the County for seven years without any prior complaints. (*Id.*). Sternberg told Strand that he should go home and think about whether he could do the job the way Sternberg wanted it done. (Strand Depo at 90).

The second sheet, titled "Tracy Strand 2nd Reprimand," states: "Called In Sick Tues. May 13th gone 14th 15th No Call Either Day." (Doc. 27, Tab 5.) When Strand saw that he was also being reprimanded because he had allegedly failed to call about his sick leave on May 13, 14 and 15, Strand advised Sternberg that his wife had called in for him and that Strand had also provided a doctor's note to be excused from work for those dates. (Sternberg was not aware of the doctor's note until after he reprimanded Strand.) When Strand said that there had been a call in and a doctor's note for his May absences, Sternberg replied, "You're fired." That was the end of the conversation.

Kniffen has not terminated or reprimanded any County employees. (Kniffen Depo at 39). Sternberg has not disciplined any other employees besides Strand. (Sternberg Depo at 36). He is not aware of anybody else who has ever received a written reprimand. (*Id.* at 45.) Sternberg could think of only one other County employee who has ever been fired other than Strand. One County

Commissioner testified that an employee who was accused of sexual harassment was only talked to and told to quit the harassing behavior.

In December 2014, Strand filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On or about December 28, 2015, Strand received a Notice of Suit Rights from the EEOC. This action followed.

In his Complaint, Strand alleges that the County violated the ADA by refusing to provide reasonable accommodations for Strand's disability, subjecting him to disciplinary actions and terminating his employment because of his disability.

The County asserts that it is entitled to summary judgment because Strand fails to establish he has a disability and, even if he has a disability, he fails to show that his employment was terminated because of his disability.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. FED.R.CIV.P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. FED.R.CIV.P. 56(c); *Anderson*, 477 U.S. at 257; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273-74 (8th Cir. 1988). All facts presented to the district court by the non-moving party are accepted as true if properly supported by

the record. *See Beck v. Skon*, 253 F.3d 330, 332–33 (8th Cir. 2001). Employment discrimination cases are not immune from summary judgment, and there is no separate summary judgment standard that applies to these cases. *See Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010).

## DISCUSSION

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In employment discrimination cases, the plaintiff bears the initial burden of establishing a prima facie case to survive summary judgment. *Miners v. Cargill Commc'ns, Inc.*, 113 F.3d 820, 823 (8th Cir. 1997). "To establish a prima facie case under the ADA, a plaintiff must show [(1)] that she was a disabled person within the meaning of the ADA, [(2)] that she was qualified to perform the essential functions of the job, and [(3)] that she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination." *Id.* (citing *Price v. S-B Power Tool*, 75 F.3d 362, 365 (8th Cir. 1996)). Once the plaintiff demonstrates a prima facie case, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Finally, after the employer produces its nondiscriminatory reasons for its actions, "the burden of production then shifts back to the plaintiff to demonstrate that the employer's proffered reason is a pretext for unlawful discrimination." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993)). The evidence produced by the plaintiff to demonstrate the prima facie case "and the 'inferences drawn therefrom may be considered by the trier of fact on the issue of whether the [employer's] explanation is pretextual.'" *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981)). Moreover, "[t]he proof necessary for discrimination cases is flexible and varies with the specific facts of each case." *Id.* (citing *Young v. Warner–Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir. 1998)).

## I. Strand's Prima Facie Case

### 1. Disabled Person within Meaning of ADA

The County first argues that Strand is not disabled within the meaning of the ADA because his alleged impairment does not substantially limit a major life activity, and therefore Strand fails to establish the first element of his prima facie case.

The ADA Amendment Act of 2008 ("ADAAA"), effective January 1, 2009, altered the analysis of this element of a plaintiff's prima facie case. The ADAAA substantially broadened the definition of a disability under the law, in explicit response to *Sutton v. United Air Lines*, 527 U.S. 471 (1999), and *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002), in which the ADA's terms defining disability had been limited, "thus eliminating protection for many individuals whom Congress intended to protect." *Rohr v. Salt River Project Agric. Imp. and Power Dist.*, 555 F.3d 850, 861 (9th Cir. 2009) (citing 122 Stat. at 3553). Under the ADAAA "disability" is to be broadly construed and coverage is to apply to the "maximum extent" permitted by the ADA and the ADAAA. *Rohr*, 555 F.3d at 861 (citing 122 Stat. at 3553); *see also* 42 U.S.C. § 12102(4)(A).

> The ADA defines "disability" as:
>
> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C.A. § 12102(1). Strand relies on the first definition of disability, arguing that he has an actual disability, *i.e.*, a substantial limitation on his ability to control elimination of waste.

42 U.S.C.A. § 12102(4) provides the following rules of construction for determining a disability under the ADA:

> (A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

(B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

(C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

(D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(E)(i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—

(I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

\*\*\*\*

42 U.S.C.A. § 12102.

i. <u>Impairment</u>

The EEOC regulations define a "[p]hysical or mental impairment" to mean

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

29 C.F.R. § 1630.2(h). To prove impairment, Strand relies on his diagnosis of colon cancer and the resulting complications from surgery, chemotherapy and radiation that caused him to have the frequent and unpredictable need to eliminate waste. Strand's medical history and testimony supports that he has a physical impairment, and the County does not contend otherwise.

9

### ii. Major Life Activity

After the enactment of the ADAAA, major life activities include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C.A. § 12102 (2)(B). The County agrees that the operation of Strand's bowel meets the definition of a major life activity. (Doc. 22 at 8.)

### iii. Substantial Limitation

The County argues that there is insufficient evidence from which a jury could find that Strand's bowel problems substantially limit his ability to perform a major life activity as compared to most people in the general population. The EEOC regulations provide the following rules of construction for determining whether an impairment substantially limits an individual:

> (i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.
>
> (ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.
>
> (iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.
>
> (iv) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

10

(v) The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

(vi) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

(vii) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(viii) An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment.

\*\*\*\*

29 C.F.R. § 1630.2(j)(1).

In arguing that Strand's bowel problems are not substantially limiting, the County focuses on the fact that Strand continued to work for the County for three years after his cancer treatment, that he could go to the bathroom outside if he needed to, "and his more frequent need to eliminate waste did not preclude him from working or limit his ability to do so." (Doc. 22 at 9-10.) Strand counters that he did not ever need to defecate outside in the three years of employment prior to his cancer diagnosis, but now he sometimes voids up to ten times a day. He takes prescription medication to try to normalize his bowel control, but it is not entirely effective. There were times he needed his wife to deliver toilet paper to him on the job when he ran out.

Viewing all facts in the light most favorable to Strand, there are genuine issues of material fact as to whether the limitation on the major life activity of the operation of his bowels is substantial.

11

## 2. Qualified to Perform Essential Functions of Job

There is no dispute that Strand was qualified to perform the essential functions of his job driving the road grader for the County, the second element of a prima facie ADA case.

## 3. Adverse Employment Action

Assuming Strand was disabled and was able to complete the essential functions of his position with or without reasonable accommodation, Strand must also meet the third element of a prima facie ADA case, *i.e*, an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. To satisfy this third and final element of a prima facie case, Strand must show

> a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. In the absence of direct evidence, the plaintiff may survive summary judgment with evidence that the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination.

*Simpson v. Des Moines Water Works*, 425 F.3d 538, 542-43 (8th Cir. 2005), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). Strand admits he does not have direct evidence that his alleged disability played a role in his termination, which is common in employment discrimination cases. Strand argues that the following facts give rise to an inference of unlawful discrimination:

> 1. After Strand returned to work in 2011 and prior to this termination in June 2014, he talked to Sternberg and Kniffen about his bowel control needs. When he asked to be able to drive to a County building Sternberg told him to go behind a tree, go into a field or behind a tire; Strand replied that suggestion was "unacceptable for what I have."
>
> 2. Kniffen admits that he and Strand talked about Strand's bathroom frequency; Kniffen said that he anticipated Strand would have bowel frequency after his cancer treatment. Kniffen acknowledges that this would cause Strand to "stop more often" and said that it was fine. Kniffen's testimony about bathroom accommodations for Strand conflicts with what Sternberg told Strand. In fact, Kniffen testified that if he were Strand's direct supervisor, permitting Strand to drive back to the shop to use an

12

indoor bathroom would have been a reasonable accommodation if he was close enough to make it back.

3. Sternberg did recall that Strand had asked him about whether the County was supposed to have port-a-potties at the gravel pits where the County was hauling from. Sternberg recalls telling Strand that port-a-potties were a contractor duty, not the County's responsibility. Sternberg did not ask anyone at the County about getting port-a-potties because "that's not my position" even though he was responsible for requisitioning other items for Highway projects.

4. Kniffen testified that Sternberg should have brought accommodation requests forward to him. According to Kniffen, Kniffen would have asked the County Commissioners about making the port-a-potty accommodation for Strand. On the other hand, Strand testified that he asked Kniffen directly about the port-a-potties and Kniffen said that that was not "necessary."

5. Strand testified that Sternberg discovered in April 2014 that Strand had driven a gravel truck out of a hauling line in order to drive to an indoor bathroom. Sternberg found out about this and confronted Strand at the end of the day. Strand said that Sternberg was belligerent about it and remarked, again, that Strand could relieve himself behind a gravel pile. This confrontation was approximately a month and half before Sternberg terminated Strand.

6. The County has a very relaxed leave policy. It was not a hassle for other employees when Strand missed work in May of 2014 due to illness.

7. After denying that Strand talked to him about his bathroom needs, Sternberg testified:

Q. [Ms. Pochop] What would you – what should you have said if [Strand] would have brought up [his need to go to the bathroom more frequently after his cancer treatments?].... What do you imagine your response to that would have been under your policies?
....

[Mr. Sternberg] I assume that – you know, like I said, call. It's just common sense. If got a – anybody sick or got problems, if you – if you got to go every 5 minutes, you shouldn't be in a blade. Call me and I'll switch with you, and you can go home. You know, if you got a medical condition, you shouldn't be in a blade.

Q. What do you mean, "if you've got a medical condition, you shouldn't be in a blade?"

13

A. If you got medical condition, you shouldn't be running a 230,000-dollar piece of equipment on a public road where people can get hurt.

(Sternberg Depo. at 61-62).

Strand argues that this testimony reveals Sternberg's discriminatory animus about Strand's requests for bathroom access and port-a-potties.

8. Strand believed that Sternberg was following him when he left work for medical appointments, and Sternberg admitted that he was noticing Strand's use of sick leave versus vacation time after going to the chiropractor. While employees are generally allowed to take time off and use either sick leave or vacation time, Sternberg had a problem with Strand putting down the missed time as sick leave instead of vacation time when Strand left work for a medical appointment.

Reviewing the record in the light most favorable to Strand, the Court finds that sufficient evidence exists from which a jury could find an inference of discrimination. Thus, Strand has met his initial burden of establishing a prima facie case of disability discrimination under *McDonnell Douglas*.

## II. Legitimate, Non-Discriminatory Reason for Discharge

As stated earlier, once a plaintiff has made out a prima facie case of disability discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802.

The County asserts that Strand was terminated for his "documented insubordination and repeated inability to follow directions from his supervisors." (Doc. 22 at 17.) The following discussion is taken directly from the section of the County's Brief in Support of Summary Judgment where the proof of this asserted reason for Strand's firing is set forth. (*See* Doc. 22 at 16-17.)

The County contends that, on more than one occasion, Strand was told by Sternberg that he needed to grade the road pursuant to Sternberg's direction, and Strand ignored these requests. (Sternberg Depo., pp. 71-73; Kniffen Depo., pp. 21-22; Strand Depo., pp. 85-86). Additionally, in

14

May 2014, Strand was off work for three consecutive days on May 13, 14, and 15, due to a kidney infection, and Strand only called in sick on May 13. (Strand Depo., pp. 77-78). Strand testified that no one told him that he did not have to call in if he was sick. (*Id.* at p. 79). Sternberg was not aware of Strand's whereabouts on May 14 or May 15, 2014, and testified that just like with all other employees, Sternberg simply wanted to know whether Strand was coming into work or not so, in his role as the supervisory, he could plan accordingly. (Sternberg Depo., p. 65). Strand knowingly ignored his supervisor's policy regarding calling in to work if he would not be coming in that day.

Thereafter, in a meeting on June 12, 2014, Sternberg issued two reprimands to Strand: one for continuing to ignore the repeated requests to blade the road properly and one for failing to call in to inform his supervisor that he would not be coming in to work for several days. (Sternberg Depo., pp 68-70). The reprimands given to Strand were approved by Kniffen and the County Commissioners. (Sternberg Depo., p. 69-70; Kniffen Depo., pp. 30-32; Voneschen Depo, p. 39; Mushitz Depo., p. 29). Kniffen testified that Sternberg, as a supervisor, has the authority to fire his employees. (Kniffen Depo., p. 38). Sternberg issued the reprimands to Strand at the meeting on June 12, 2014, without the intention of firing Strand, but rather to remind him, via a written notice, of the things that needed to be done and what was expected of Strand as an employee. (Sternberg Depo., p. 43). After getting insubordinate with Sternberg, Sternberg requested that Strand take the weekend to cool-down and Strand refused to do so and repeatedly told Sternberg to fire him. Ultimately Sternberg determined Strand was disrespectful and insubordinate and terminated him during this exchange. (*Id.* at 15; 42-43). Strand's termination, and the reasons therefore, were later approved by Kniffen and the County Commissioners. (Kniffen Depo., p. 41; Voneschen Depo., pp. 36-37).

### III. Pretext

The burden then shifts back to the plaintiff to adduce sufficient evidence to establish that the employer's legitimate reason was a pretext for the employment discrimination. According to the Eighth Circuit

> There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext. A plaintiff may show that the employer's explanation is unworthy of credence ... because it has no basis in fact. Alternatively, a plaintiff may show

15

pretext by persuading the court that a [prohibited] reason more likely motivated the employer. A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision.

*Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 904 (8th Cir. 2015) (internal citations and quotation marks omitted).

Strand relies on the following facts as evidence of the pretextual nature of the County's explanation of Strand's reprimand and termination:

1. Neither Sternberg or Kniffen had ever written up a disciplinary action for anyone before the two reprimands for Strand.

2. County Commissioners and supervisors could not come up with many examples of employees who have been fired by the County.[1]

3. A County Commissioner testified in his deposition that an employee who had complaints of sexual harassment against him was talked to and told to quit the harassment.

4. It is not clear why Strand was issued a written reprimand for his blading on June 12, 2014, when he had worked for the County for seven years without a single reprimand or disciplinary incident.

5. The leave policy is very relaxed, and Strand's absence from work in May of 2014 did not cause a hassle for any other employee. Sternberg admitted that he does not know if Strand violated any County policy by not calling in on May 15 and 16. Strand had not been required to call in during his extended leave for his cancer treatment so this was new to him.

---

[1] Along with its Reply Brief, the County submitted the Affidavit of Sherri Fuchs. (Doc. 34.) Fuchs, the County Auditor, attests that in the 1990s the County terminated another male highway worker who did not have a medical condition "due to his failure to follow direction, his poor attitude, and insubordination." (Doc. 34 at ¶ 2.) This evidence does not persuade the Court that the County is entitled to summary judgment in this case.

16

6. Sternberg could not recall talking to Strand about the sick leave issue when Strand returned to work after May 15, 2014, and Sternberg could not explain why he waited until June 12 to address the sick leave issue with Strand by way of written reprimand.

When the evidence is viewed most favorably to Strand, giving him the benefit of all reasonable inferences, sufficient evidence has been identified to allow a reasonable jury to conclude that his alleged disability was a reason for Sternberg's decision to fire him. Thus the Court must deny the County's motion for summary judgment. Accordingly,

IT IS ORDERED that Defendant's motion for summary judgment, doc. 20, is denied.

Dated this 5th day of May, 2017.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
(SEAL)        DEPUTY